John DOE, Plaintiff,

v.

UNIVERSITY OF COLORADO, BOULDER, THROUGH its Board, the BOARD OF REGENTS OF the UNIVERSITY OF COLORADO; Christina Gonzales, individually and as agent for the University of Colorado, Boulder; Alexandra Tracy–Ramirez, individually and as agent for the University Colorado, Boulder; and Jessica Doty, individually and as agent for the University of Colorado, Boulder, Defendants.

Civil Action No. 16–cv–1789–WJM–KLM

United States District Court,
D. Colorado.

Signed 05/26/2017

Tara Jill Davis, Nesenoff & Miltenberg, LLP, New York, NY, Michael J. Mirabella, Michael Mirabella, P.C., Denver, CO, for Plaintiff.

David P. Temple, Erica Mae Weston, University of Colorado–Office of University Counsel, Cathy Havener Greer, Katherine M.L. Pratt, Wells, Anderson & Race, LLC, Rachel Ollar Entrican, Colorado Attorney General's Office–Dept. of Law Department of Law, Denver, CO, for Defendants.

### ORDER ON PENDING MOTIONS

William J. Martínez, United States District Judge

Title IX of the Civil Rights Act of 1964, 20 U.S.C. § 1681 *et seq.* ("Title IX"), declares that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Federal agencies "empowered to extend Federal financial assistance to any education program or activity" may promulgate regulations to enforce this prohibition, and may terminate an educational institution's federal funding if the institution does not comply with these regulations. *Id.* § 1682.

Congress added Title IX to the Civil Rights Act in 1972, when "the concept of

sexual harassment as [a form of] gender discrimination had not been recognized or considered by the courts." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 664, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (Kennedy, J., dissenting) (internal quotation marks omitted). Fourteen years later, however, the Supreme Court recognized in a Title VII (employment discrimination) context that sexual harassment which creates a hostile working environment is a form of sex discrimination for which employers may be held liable. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Since at least the mid–1990s, the Department of Education's Office of Civil Rights ("OCR") has applied this principle to Title IX, advising that sexually harassing conduct, including "unwelcome sexual advances" by one student to another, can create a hostile, sexually discriminatory educational environment; and that schools may lose their federal funding "if (i) a hostile environment exists in the school's programs or activities, (ii) the school knows or should have known of the harassment, and (iii) the school fails to take immediate and appropriate corrective action." 62 Fed. Reg. 12034, 12038, 12039 (Mar. 13, 1997).[1]

"Unwelcome sexual advances" obviously includes sexual assault, thus raising the question of what Title IX requires of schools—particularly colleges and universities—when they learn of alleged student-on-student sexual assault. Department of Education regulations generically require "grievance procedures providing for prompt and equitable resolution of . . . complaints alleging any action that would be prohibited [under Title IX]," 34 C.F.R. § 106.8(b), and "Title IX . . . permits the use of a student disciplinary procedure not designed specifically for Title IX grievances to resolve sex discrimination complaints, as long as the procedure meets the requirement of affording a complainant a 'prompt and equitable' resolution of the complaint," 62 Fed. Reg. at 12045. But what sort of procedure provides a "prompt and equitable resolution" for a claim of rape?

Noting that "[t]he statistics on sexual violence [on college campuses] are both deeply troubling and a call to action for the nation," OCR ventured an answer to this question in a 2011 "Dear Colleague Letter." *See* Russlynn Ali, Assistant Sec'y for Civil Rights, *Dear Colleague Letter* at 2 (Apr. 4, 2011), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (last accessed May 12, 2017). This letter appears to have had two major effects. First, it generally signaled that OCR had adopted a "get tough" approach, thus prompting colleges and universities to devote more attention to sexual assault accusations. Second, the letter announced OCR's view that school investigators should apply a preponderance-of-the-evidence standard when determining whether a sexual assault accusation is founded, in contrast to higher standards "currently used by some schools." (*Id.* at 10–11.) Thus, it became easier for schools to take action against alleged perpetrators.

As another district court has aptly noted, the Dear Colleague Letter has led to a "wave of litigation" brought by male university students who have been suspended or expelled after they had been found, after allegedly faulty investigations, to have violated school policies regarding sex-

---

1. In 1999, the Supreme Court similarly held that a student may bring a damages action under Title IX against the student's educational institution if the institution is deliberately indifferent to sufficiently severe student-on-student harassment of which institutional offi-

cials are actually aware, because such deliberate indifference is a choice to "subject[ ]" a student to discrimination within the meaning of Title IX. *Davis*, 526 U.S. at 641–53, 119 S.Ct. 1661.

ual assault. *Doe v. Brown Univ.*, 166 F.Supp.3d 177, 181 (D.R.I. 2016) (*"Brown"*). That wave has washed over this Court at least once before, *see Johnson v. W. State Colo. Univ.*, 71 F.Supp.3d 1217 (D. Colo. 2014), and now returns.

Plaintiff was expelled from Defendant University of Colorado at Boulder ("the University") in August 2014 after the University's Title IX office concluded by a preponderance of the evidence that he had raped two female students in separate incidents. Plaintiff now claims that the University's Title IX process was biased toward him because he is male, and therefore the University discriminated against him on the basis of sex in violation of Title IX. Plaintiff also brings a Fourteenth Amendment procedural due process claim and various state-law claims. (*See generally* ECF No. 26.) Apart from the University, Plaintiff has sued three University officials who had some role in the investigation of the accusations against him, or in the decision to expel him: Christina Gonzalez ("Gonzalez"), the University's Title IX co-coordinator; Alexandra Tracy–Ramirez ("Tracy–Ramirez"), the Title IX investigator assigned to his case; and Jessica Doty ("Doty"), head of the University's Office of Student Conduct. The Court will refer to these three individuals collectively as the "Individual Defendants."

Currently before the Court is the Individual Defendants' Motion to Dismiss (ECF No. 28) and the University's Motion to Dismiss (ECF No. 52).[2] For the reasons explained below the Court grants the Individual Defendants' motion in full, and grants the University's motion as to all claims except prospective injunctive relief under Plaintiff's procedural due process claim. However, the Court must still dismiss that claim—although without prejudice—because it is unclear whether Plaintiff has sued the right state official. Plaintiff will therefore be granted leave to amend as to his procedural due process claim.

## I. RULE 12(b)(6) STANDARD

### A. General Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." The 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955).

### B. Documents Outside the Pleadings

 The University and the Individual Defendants ask this Court to consider ad-

---

**2.** Also before the Court is Plaintiff's Amened [*sic*] Motion for Leave to Submit Supplemental Authority. (ECF No. 86.) Although the Court does not necessarily agree with Plaintiff's supplemental authorities, the Court has reviewed them and therefore this motion is granted.

ditional documents they have placed in the record, namely, Defendant Tracy–Ramirez's final report of her investigation into the alleged assaults at issue in this lawsuit (ECF Nos. 28–1, 52–1), and the University's Student Conduct Code Policies & Procedures for the 2013–14 academic year (ECF Nos. 28–2, 52–2). The Court may consider these documents if they are (1) "mentioned in the complaint," (2) "central to [the] claims [at issue]," and (3) not challenged as inauthentic. *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013).[3]

■ Here, all three elements are satisfied. Both documents are frequently mentioned, sometimes quoted, and generally relied upon in the currently operative complaint as evidence of Defendants' liability. (*See* ECF No. 26 ¶¶ 80–95 (Tracy–Ramirez's report); *id.* ¶¶ 27–38, 137–50 (Student Conduct Code).) Thus, these documents are both "mentioned" and "central" to Plaintiff's claims. Moreover, Plaintiff does not argue that these documents are inauthentic, nor has he stated any other objection to the Court considering them as if part of his complaint. The Court will therefore consider them for purposes of the Rule 12(b)(6) analysis below. However, there are instances, noted below, when Plaintiff's complaint alleges the contents of certain documents and those allegations appear to contradict Tracy–Ramirez's report of what the same documents contain. In those instances, the Court has adopted

Plaintiff's allegation as true for present purposes.

## II. FACTS

The Court accepts the following facts as true for purposes of the University's and the Individual Defendants' respective Motions to Dismiss.[4]

### A. The Initial Accusation and Suspension

Plaintiff enrolled at the University in Fall Semester 2012. (ECF No. 26 ¶ 25.) Up until the accusations that ultimately prompted his expulsion, he was the member of a fraternity (the "Fraternity") and he lived in off-campus Fraternity housing. (*Id.* ¶ 26; ECF No. 28–1 at 4.)

On April 15, 2014, Title IX co-coordinator Gonzalez received an anonymous phone call during which the caller accused Plaintiff of raping two female University students—"Jane Doe 1" and "Jane Doe 2"—in separate incidents. (ECF No. 26 ¶¶ 20, 39; ECF No. 28–1 at 1.) Someone in the University's Office of Student Conduct then attempted to contact Jane Does 1 and 2. (*Id.* at 42.)

Two days later, Gonzalez summarily suspended Plaintiff, excluded him from campus, and prohibited him from contacting Jane Doe 1 (but said nothing about Jane Doe 2). (ECF No. 26 ¶ 49.) Gonzales did not speak with Plaintiff, Jane Doe 1, or Jane Doe 2 before issuing the suspension. (*Id.*)

---

3. "If the rule were otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997); *see also Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F.Supp.2d 919, 923 (N.D. Ill. 1999) ("it would be totally wasteful to uphold a claim on the false premise created by less than complete documentation when the de-

layed consideration of the remaining documents would lead to dismissal of that claim").

4. Some of the evidence and most of the arguments submitted by the parties were filed under Restricted Access. To the extent the Court quotes or summarizes such materials in this Order, the Court has concluded that the portions quoted or summarized do not qualify for Restricted Access under D.C.COLO.LCivR 7.2.

**B. Jane Doe 1's Interview**

Tracy–Ramirez, a Title IX investigator for the University, was assigned to investigate the allegations against Plaintiff. (*Id.* ¶ 21.) Her first interview was with Jane Doe 1, on April 21, 2014. (*Id.* ¶ 40.) At that interview, Jane Doe 1 agreed to provide her recollection of Plaintiff's alleged rape. (ECF No. 28–1 at 22.)

Jane Doe 1 remembered the date of the incident under investigation because it was the day before the University's season-opening football game the previous September. (*Id.*) She did not have any memory of sexual contact with Plaintiff, however. She instead remembered drinking alcohol at a Fraternity-hosted party, then waking up naked in an unfamiliar bed, and finally waking up clothed in her own bed. (*Id.*) She learned from a friend that Plaintiff had walked her home, although she had no memory of that, or of seeing Plaintiff at any time the previous night. (*Id.*) Nonetheless, that next morning, "she could 'tell' from physical sensations" that vaginal intercourse has recently occurred. (*Id.*)

Jane Doe 1 further recalled that, soon after the night in question, she heard from others that Plaintiff had been bragging about having had sex with her. (*Id.*) Then, over the University's recent Spring Break (in March 2014), she had been speaking with a friend, Jane Doe 2, who apparently volunteered that Plaintiff had raped her (*i.e.*, Jane Doe 2). (*Id.*) Jane Doe 1 "shared with Jane Doe 2 her own concerns about [Plaintiff]." (*Id.* at 23.) And, shortly after Spring Break, Jane Doe 1 "started hearing rumors from friends in common that [Plaintiff] talked about having had sex with Jane Doe 1 and told people that 'she said no, no, but I kept going.' " (*Id.*)

**C. Jane Doe 2's Interviews**

Jane Doe 2 did not respond to any of Tracy–Ramirez's phone calls until May 2, 2014. (ECF No. 26 ¶ 46; ECF No. 28–1 at 29.) On that date, Jane Doe 2 spoke with Tracy–Ramirez by phone and asked her what she knew about the alleged encounter between Plaintiff and Jane Doe 2. (*Id.*) Tracy–Ramirez explained that she had learned from witnesses (discussed below) that Jane Doe 2 had accompanied John Doe to his room after a relatively recent fraternity party, that Jane Doe 2 had been sober at this time, and that John Doe forced himself on her despite her protests. (*Id.*) Jane Doe 2 confirmed that Tracy–Ramirez's account was accurate, but apparently chose not to provide any more details at that time and said that she would be in touch. (*Id.*)

Jane Doe 2 did not re-initiate contact until June 6, 2014, when she called to express unspecified "concerns related to the situation." (*Id.*) She did not offer any more information to Tracy–Ramirez except that the alleged rape took place in the early morning hours of March 9, 2014. (*Id.*)

Tracy–Ramirez and Jane Doe 2 spoke for a third and apparently last time on June 23, 2014. (*Id.*) Without providing details, Jane Doe 2 told Tracy–Ramirez that "she's not the only person [Plaintiff has] hurt. She said 'he did it to other people' too." (*Id.*)

**D. Interviews with Witnesses**

Throughout this time, Tracy–Ramirez was also interviewing ten potential witnesses (seven male and three female). (*Id.* at 3.) Most of these witnesses had knowledge about the incident with Jane Doe 1, but not with Jane Doe 2. Concerning Jane Doe 1, six witnesses generally confirmed one or more of the following: that Jane Doe 1 had been intoxicated on the night in question; that she had left the Fraternity party with Plaintiff; that she believed she and Plaintiff had engaged in sexual intercourse that night, but she could not remember; that Plaintiff walked her home that night; that, soon after, Plaintiff had

boasted about having sex with Jane Doe 1; and that Plaintiff, many months later, recounted to others that Jane Doe 1 had been telling Plaintiff on the night in question that she did not want to have sex, but he persisted. (*See id.* at 14–21, 24–26.)

As for Jane Doe 2, Tracy–Ramirez interviewed the president of Jane Doe 2's sorority (the "Sorority"). (*Id.* at 27.) The Sorority president reported that Jane Doe 2 approached her not long after Spring Break and announced that she (Jane Doe 2) wanted to resign her position as social chair of the Sorority. (*Id.*) When the Sorority president asked why, Jane Doe 2 explained that an upcoming "Greek Week" would require her, as social chair, to be in the presence of Plaintiff, and she did not want that.[5] (*Id.*) Jane Doe 2 then revealed that, shortly before Spring Break, she and Plaintiff had been together after a Fraternity party, and that Plaintiff had forced himself on her despite her unequivocal protests. (*Id.*) Jane Doe 2 said that she did not want Plaintiff to get in trouble, but only wanted to avoid being in his presence. (*Id.*)

Shortly after this exchange with Jane Doe 2, the Sorority president reported to the Fraternity's president that one of his Fraternity brothers had raped one of her Sorority sisters. (*Id.* at 7.) But—perhaps respecting Jane Doe 2's wish not to get Plaintiff in trouble—the Sorority president did not reveal any names. (*Id.* at 28.)

Tracy–Ramirez interviewed the Fraternity president, who confirmed that the Sorority president had made such a report to

him. (*Id.* at 7.) Soon after receiving that report, Jane Doe 1's boyfriend (also a Fraternity brother) approached the Fraternity president and told him that he had heard from Jane Doe 1 that she and Jane Doe 2 had been talking over Spring Break and had concluded that Plaintiff had raped them both. (*Id.*) Given this information, the Fraternity president surmised that the alleged rape reported by the Sorority president had been committed by Plaintiff against Jane Doe 2, and so Plaintiff was now being accused of two rapes—one against Jane Doe 1 and another against Jane Doe 2. (*Id.*) The Fraternity president then "decided to notify the Dean of Students." (*Id.*) Tracy–Ramirez confirmed that the Fraternity president, was the anonymous caller who spoke with Gonzalez on April 15, 2014, thus prompting the very investigation in which Tracy–Ramirez was then engaged. (*Id.* at 41.)

### E. Plaintiff's Involvement in the Investigation

As Tracy–Ramirez pursued interviews with Jane Does 1 and 2, and with witnesses, she also was communicating with Plaintiff. On April 21, 2014 (the same day as her interview with Jane Doe 1), Tracy–Ramirez e-mailed a "Notice of Investigation" to Plaintiff. (ECF No. 26 ¶ 51.) This Notice contains no details regarding the accusations against Plaintiff, but instructed him to contact Tracy–Ramirez and schedule a meeting by April 24, (*Id.*)[6] That meeting ended up taking place on April 26. (*Id.* ¶ 52.)[7] Tracy–Ramirez gave an oral

---

**5.** Apparently Plaintiff was social chair of the Fraternity. (*Id.* at 41.) The Court presumes that Plaintiff's and Jane Doe 2's corresponding positions at their respective organizations would require some sort of interaction during "Greek Week."

**6.** Tracy–Ramirez's report states that the Notice of Investigation informed Plaintiff of the allegation of "non-consensual sexual contact and/or intercourse with a female student"

which took place "[o]n or about August 31, 2013." (ECF No. 28–1 at 2.) Because the Notice itself is not in the record and because Plaintiff provides a contrary account, the Court accepts Plaintiff's version of events for present purposes.

**7.** Tracy–Ramirez's later report states that this meeting took place on April 29. (ECF No. 28–1 at 4.) Nothing in the record suggests that

account of Jane Doe 1's accusations and told Plaintiff that "he had one opportunity to respond, at that one-hour meeting. Defendant Tracy–Ramirez further told Plaintiff that any information he provided after the meeting would not be considered as part of his defense." (*Id.*)

Plaintiff himself does not describe his response either to this ultimatum or to the accusations Tracy–Ramirez was relaying from Jane Doe 1. Tracy–Ramirez's report recounts Plaintiff's reaction as follows: "[Plaintiff] and his advisor [an attorney] stated that because they had just learned about the 'who, what, and when' they would not be able to respond but would like to at some other point in time." (ECF No. 28–1 at 4.)

On May 1, 2014, Plaintiff's attorney sent a letter to the University "requesting an opportunity to review the contents of the ongoing investigation file, and protesting the manner in which Defendant Tracy–Ramirez was conducting the investigation." (ECF No. 26 ¶ 14.) Plaintiff does not say whether this letter elicited any response.

On May 7, 2014, Tracy–Ramirez transmitted to Plaintiff a "Revised Notice of Investigation." (ECF No. 26 ¶ 54.) Plaintiff provides no details of this Revised Notice. Tracy–Ramirez's report states that it provided all the relevant details she had learned about the alleged rape of Jane Doe 1, including the intoxication, Plaintiff's boasting about the sexual encounter, and his statements to others that Jane Doe 1 "repeatedly told [him] 'no' and that [he] continued the activity anyway." (ECF No. 28–1 at 2.)

On May 9, 2014, Plaintiff or his attorney communicated with the University's coun-

sel, again requesting an opportunity to review the investigative file. (ECF No. 26 ¶ 55.) The University's counsel eventually "cut off contact, but first advised Plaintiff that he was required to respond to the Revised Investigation Notice on or before May 27, 2014." (*Id.*)

On the specified date, Plaintiff e-mailed a written response complaining about his continuing inability to obtain "specific information about the accusations against me." (ECF No. 28–1 at 4.) Plaintiff nonetheless declared,

> [I]t is not true that on or about August 31, 2013 I attended a party that began on [Fraternity] property where alcohol was served. More importantly, I did not have nonconsensual sexual contact and intercourse with [Jane Doe 1] in my room on or about August 31, 2013, or at any other time for that matter. I did not have sexual contact and intercourse with her on or about August 31, 2013 or at any other time, knowing that she lacked the capacity to consent due to her level of intoxication; and I did not have sexual contact and intercourse with her after she repeatedly told me no. All of those accusations are false, as is any report that I have made statements admitting to doing any of those things.

(*Id.* at 5.)

On June 10, 2014, Tracy–Ramirez issued a new Notice of Investigation, this one related specifically to Jane Doe 2. (ECF No. 26 ¶ 57.) "The notice provided only vague allegations and did not identify Jane Doe 2 by her full name." (*Id.*)[8] Plaintiff submitted a written response to this No-

---

this discrepancy is material to any issue the Court must currently decide.

**8.** Tracy–Ramirez's report quotes this second Notice, and—assuming the quote is accurate—it appears to have provided all of the

details Tracy–Ramirez had learned from Jane Doe 2, including the precise date and location of the alleged rape. (ECF No. 28–1 at 2.) Again, however, the Notice itself is not in the record and so the Court will accept Plaintiff's account of its contents for present purposes.

tice on June 16, 2014, denying the accusations. (*Id.* ¶ 58.)

On July 2, 2014, Plaintiff and his attorney were permitted to view the investigation file but not to make copies of anything contained in it. (*Id.* ¶ 59.) Tracy–Ramirez expected Plaintiff to meet with her to present his defense on that same day, but Plaintiff objected and received a one-week extension. (*Id.*)

On July 9, 2014, Plaintiff's attorney submitted a written statement (*id.* ¶ 60), apparently in lieu of meeting with Tracy–Ramirez in person. This statement accused Tracy–Ramirez of presuming Plaintiff guilty until proven innocent, and of denying him due process, such as by denying him the right to confront his accusers and cross-examine witnesses. (*Id.*) Given this lack of trial-like procedure, Plaintiff's attorney announced that "there is nothing more that [Plaintiff] can do than repeat that he is innocent of the accusations against him." (ECF No. 28–1 at 6.)

At two unspecified times—presumably before Plaintiff's July 9 statement—Tracy–Ramirez contacted Plaintiff "to remind him of his opportunity to provide names of anyone he believed might have relevant or helpful witness information but he did not provide any such information." (*Id.* at 6.)

### F. Tracy–Ramirez's Report and Plaintiff's Expulsion

On July 24, 2014, Tracy–Ramirez issued her report. She found Jane Doe 1, Jane Doe 2, and all of the witnesses credible. (*Id.* at 30–37.) She found Plaintiff not credible, largely based on contradictions between his claims and those made by multiple other witnesses. (*Id.* at 37–38.) Also, while claiming that Plaintiff's choice to interact largely through written statements "d[id] not detract from his credibility, the absence of a substantive interview did deprive this investigator of the opportunity to ask detailed questions about

[Plaintiff's] perspective and assess his level of forthrightness." (*Id.* at 37.) Plaintiff characterizes this as "an adverse inference against [him] for failing to meet in person or provide more details about the accusations." (ECF No. 26 ¶ 61.) In any event, Tracy–Ramirez found "that it is more likely than not" that Plaintiff engaged in sexual intercourse with Jane Doe 1 under circumstances where Plaintiff could not have reasonably concluded that Jane Doe 1 consented to the intercourse. (ECF No. 28–1 at 49–50.) Tracy–Ramirez concluded similarly with respect to Jane Doe 2. (*Id.* at 51–52.)

On July 25, 2014, a "review panel" (otherwise unexplained) allegedly "rubber stamped" Tracy–Ramirez's report. (ECF No. 26 ¶ 62.) On August 26, 2014, Doty (head of the University's Office of Student Conduct) permanently expelled Plaintiff from the University. (*Id.* ¶¶ 22, 63.) Plaintiff had no right to appeal Tracy–Ramirez's decision, the review panel's decision, or Doty's decision. (*Id.* ¶¶ 61–63.)

Upon his expulsion, the University informed Plaintiff that it would place a permanent notation on his academic transcript stating that he had violated the University's sexual conduct standards. (*Id.* ¶¶ 63–64.) Perhaps fearing this potential consequence, Plaintiff transferred from the University before the end of Tracy–Ramirez's investigation. (*Id.* ¶ 64.) Plaintiff nonetheless continues to fear that the notation on his transcript "will severely impact his future graduate school and career prospects." (*Id.*)

### III. ANALYSIS

#### A. Title IX Claim Against the University

Apparently the Second Circuit was the first court to recognize a private Title IX cause of action based on the theory that a

campus disciplinary proceeding was improperly motivated or affected by the respondent's sex. *See Yusuf v. Vassar College*, 35 F.3d 709, 714–15 (2d Cir. 1994). *Yusuf* expounded two theories—really, evidentiary templates—under which a cause of action would lie. The first theory, commonly referred to as "erroneous outcome," requires a plaintiff to "allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Id.* at 715. The second theory, known as "selective enforcement," "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* "While some of the elements of the claims are different under these theories, both require that a Plaintiff show that gender bias was a source of the deprivation." *Johnson*, 71 F.Supp.3d at 1224. The Court finds that the gender bias element of the claim is dispositive here, and so it need not address the distinctions between the erroneous outcome and selective enforcement theories.

### 1. Debate Over the Pleading Standard

*Yusuf* itself held that the plaintiff had adequately pleaded a claim under the erroneous outcome theory because the plaintiff alleged "that males accused of sexual harassment at Vassar are 'historically and systematically' and 'invariably found guilty, regardless of the evidence, or lack thereof'"—even though the plaintiff provided no factual support for this assertion. *Id.* at 716. In other words, *Yusuf* accepted an essentially conclusory allegation.

Courts disagree whether *Yusuf* remains good law on this point in the wake of *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). *See, e.g., Austin v. Univ. of Oregon*, 205 F.Supp.3d 1214, 1223 (D. Or. 2016) (discussing the split of authority); *Brown*, 166 F.Supp.3d at 186 (same). Some district

courts have continued to accept conclusory allegations of gender bias, or those made "on information and belief," even after *Twombly* and *Iqbal*, sometimes noting the asymmetry of information as between the plaintiffs and defendants. *See, e.g., id.* at 188–90; *Doe v. Salisbury Univ.*, 123 F.Supp.3d 748, 768–69 (D. Md. 2015); *Wells v. Xavier Univ.*, 7 F.Supp.3d 746, 751–52 (S.D. Ohio 2014). Others have accepted, on the facts before them, inferences based on allegedly gender-biased statements reported in the press and attributed to school administrators. *See, e.g., Doe v. Washington & Lee Univ.*, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (pleading burden satisfied through Title IX officer's highly gender-specific publications and teachings regarding consent to sex). At least one court has been willing to assume that allegations of pressure exerted by the Dear Colleague Letter, or by press reports of specific incidents involving males who were not disciplined for allegedly assaulting females, are essentially equivalent to allegations of gender bias. *See Doe v. Lynn Univ., Inc.*, 235 F.Supp.3d 1336, 1340–43, 2017 WL 237631, at *4–5 (S.D. Fla. Jan. 19, 2017).

A majority of cases, however, have held that *Yusuf*-like pleading of the gender bias component no longer passes muster, and that the various plaintiffs' allegations largely tend to show, if anything, pro-victim bias, which does not equate to anti-male bias. *See, e.g., Doe v. Baum*, 227 F.Supp.3d 784, 816–22, 2017 WL 57241, at *23–27 (E.D. Mich. Jan. 5, 2017); *Austin*, 205 F.Supp.3d at 1222–27; *Doe v. Regents of the Univ. of Cal.*, 2016 WL 5515711, at *4–6 (C.D. Cal. July 25, 2016); *Doe v. Univ. of Cincinnati*, 173 F.Supp.3d 586, 606–08 (S.D. Ohio 2016) ("*Cincinnati*"); *Marshall v. Ohio Univ.*, 2015 WL 7254213, at *5–8 (S.D. Ohio Nov. 17, 2015); *Ludlow v. Northwestern Univ.*, 125 F.Supp.3d 783, 791–93 (N.D. Ill. 2015); *Doe v. Univ. of*

*Mass.–Amherst*, 2015 WL 4306521, at *6–9 (D. Mass. July 14, 2015); *Sahm v. Miami Univ.*, 110 F.Supp.3d 774, 777–80 (S.D. Ohio 2015); *Yu v. Vassar Coll.*, 97 F.Supp.3d 448, 461–81 (S.D.N.Y. 2015).

The Second Circuit itself recently returned to its *Yusuf* decision, and did not quite endorse *Yusuf*'s continuing viability as-is, but nonetheless endorsed a relatively low pleading standard. *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016) ("*Columbia*"). In *Columbia*, the Second Circuit drew upon one of its post-*Iqbal* Title VII cases that supposedly established a "minimal plausible inference" pleading standard for such claims. *See id.* at 54–56 (citing *Littlejohn v. City of New York*, 795 F.3d 297, 307–11 (2d Cir. 2015)). Moreover, the Second Circuit accepted as minimally plausible the plaintiff's allegation that Columbia University acted with anti-male bias based on

> substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students. [The complaint] alleges further that the University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue. Against this factual background, it is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault.

*Id.* at 57. As to the claim that Columbia acted, at most, with pro-victim bias rather than anti-male bias, the court answered that "[t]his reasoning fails to recognize the court's obligation to draw reasonable inferences *in favor of* the sufficiency of the complaint." *Id.* (emphasis in original).

### 2. Concerns Regarding the "Pro–Victim, Not Anti–Male" Justification

Before the Court turns its own analysis of the pleading standard and its application to the allegations at hand, the Court first clarifies the role of certain arguments. The University urges this Court to adopt the reasoning accepted by many other courts faced with similar accusations, *i.e.*, that the recent wave of sexual assault disciplinary proceedings more readily shows pro-victim bias than anti-male bias. (*See* ECF No. 52 at 16–17.) This may be true, but caution is required before accepting such an argument without reflection.

The District of Oregon, for example, is surely correct when it declared, "It is a simple fact that the majority of accusers of sexual assault are female and the majority of the accused are male, therefore enforcement is likely to have a disparate impact on the sexes." *Austin*, 205 F.Supp.3d at 1225. But how far does this reasoning go? The vast majority of nurses in America are female. If the administration of a particular hospital begins to crack down on complaints against nurses, the administrators could similarly proclaim that they are pro-patient, not anti-female. But there also may be circumstances in which an inference of sex discrimination becomes plausible. Or consider a city whose various taxi fleets are dominated by members of a particular immigrant ethnicity. If police officers or the local regulatory body begin to "pay more attention to"—or from the drivers' perspective, "regularly harass"— taxi drivers, government officials could claim that they are protecting passengers, not discriminating against those of the taxi drivers' ethnicity. But again, there also may be circumstances in which an inference of ethnicity discrimination becomes

plausible. Indeed, if enforcement officials are regularly presented with a scenario involving the same two potential classifications—nurse and female, taxi driver and ethnic minority, sexual assault suspect and male—there must come a point when one may plausibly infer that stereotypes about the protected classification (such as gender or ethnicity) have begun to infect the enforcement process generally.

The problem is only heightened in the context presented here, and in the many other similar Title IX cases decided in recent years. In every case the Court has located, the accuser has been female and the accused has been male—and these individuals were, not surprisingly, the only potential eyewitnesses to the alleged assault. Thus, enforcement officials often must make a credibility judgment as between a male and female, which doubles the possibility of gender-specific stereotypes influencing the investigation (e.g., "a woman would never falsely accuse anyone of that," "men always behave opportunistically toward drunk girls").

Nonetheless, circumstances exist in which one inference necessarily overwhelms another at the pleading phase. This is perhaps the major doctrinal innovation of *Iqbal*, where the Supreme Court refused to credit an inference of religious bias when then FBI Director Robert Mueller allegedly directed the arrest of numerous Muslim men in the wake of the September 11th terrorist attacks:

> The September 11 attacks were perpetrated by 19 Arab Muslim hijackers who counted themselves members in good standing of al Qaeda, an Islamic fundamentalist group. Al Qaeda was headed by another Arab Muslim—Osama bin Laden—and composed in large part of his Arab Muslim disciples. It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of

their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims. On the facts respondent alleges the arrests Mueller oversaw were likely lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts. As between that obvious alternative explanation for the arrests, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion.

*Iqbal*, 556 U.S. at 682, 129 S.Ct. 1937 (citation and internal quotation marks omitted). In this light, the Court cannot entirely disregard the public context of Plaintiff's accusations, such as the Dear Colleague Letter and other potential forms of pressure on the University, discussed below.

### 3. Application

The Court basically agrees with the Second Circuit that Plaintiff needs no more than a "minimally plausible inference" to satisfy the *Twombly/Iqbal* pleading standard, see *Columbia*, 831 F.3d at 54–56, but the Court does not read this as some sort of weakening of *Twombly* and *Iqbal*. Either the complaint states a plausible claim or it does not—the *degree* of plausibility only becomes relevant when an "obvious alternative explanation," *Iqbal*, 556 U.S. at 682, 129 S.Ct. 1937 (internal quotation marks omitted), overwhelms any inference of liability that might otherwise exist.

The Court disagrees with cases that continue to accept conclusory allegations of gender bias. *Twombly* and *Iqbal* plainly disallow such acceptance. For similar reasons, the Court disagrees with cases that accept allegations of gender bias purely "on information and belief," with no expla-

nation of the information leading to that belief.

With this in mind, the Court turns to Plaintiff's allegations that, according to him, raise a plausible inference bias against males *qua* males. In this regard, he generally asserts four categories of evidence.

■ First, he notes that the University "employed an all-female Title IX team, including Defendants Gonzalez and Tracy–Ramirez, to investigate the accusations against Plaintiff." (ECF No. 26 ¶ 65.) It is not clear what Plaintiff views as the "Title IX team," if not confined to Gonzalez and Tracy–Ramirez. Indeed, as far as Plaintiff's complaint reveals, only one individual—Tracy–Gonzales—"investigate[d] the accusations against Plaintiff." In any event, the Court has already rejected the argument that gender uniformity, without more, leads to an inference of gender bias. *See Johnson*, 71 F.Supp.3d at 1225–26. Thus, on its own this does little to "nudge[ ] [Plaintiff's] claim[ ] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. Nonetheless, the Court will consider it in evaluating Plaintiff's allegations as a whole, below.

Second, Plaintiff alleges that Tracy–Ramirez's "career focus has been in the area of Women's Studies and victim advocacy, including the authorship of papers and presentations on sexual assault and how to support victims of sexual assault." (ECF No. 26 ¶ 66.) Elaborating, Plaintiff asserts that Tracy–Ramirez's anti-male bias comes through in an April 2016 news article in which she was quoted. (*Id.*) The article reports on the case of a Brigham Young University student who alleged she had been raped, but was then investigated by the university for her own (unspecified) violations of the student code of conduct that apparently arose out of, or came to light because of, the same incident. *See* Sarah Brown, "A Sex Assault Case at Brigham Young Puts Honor Codes in the Spotlight," *Chronicle of Higher Education*(Apr. 18, : 2016), at http://www.chronicle.com/article/A–Sex–Assault–Case–at–Brigham/236145 (last accessed May 12, 2017; subscription required).[9] The article discusses, among many other things, a report (later denied by the university) that the university was pressing forward with its code of conduct investigation, despite an ongoing criminal inquiry into the rape, because the "Department of Education's guidance on [Title IX] recommends that colleges complete sexual assault investigations within 60 days." *Id.* Tracy–Ramirez, who had been quoted earlier in the article on a point not relevant here, was quoted as follows regarding this 60–day timeline:

> Several experts said that invoking Title IX as a reason to move quickly with honor-code proceedings ... was unreasonable. Title IX permits colleges to delay internal proceedings if their efforts are interfering with a criminal investigation, Ms. Tracy–Ramirez said. The 60–day suggested window for colleges to complete a Title IX process, she said, is designed to ensure that officials take steps to help victims and perhaps suspend or expel perpetrators while the much-lengthier criminal process runs its course.

*Id.* Plaintiff, somewhat disingenuously, presents the statements attributed to Tracy–Ramirez as if they were direct quotes, which the article itself does not do. In any event, Plaintiff argues that Tracy–Ramirez's apparent use of the word "perpe-

---

9. Plaintiff cites this as a Bloomberg News article (ECF No. 26 ¶ 66), but Plaintiff does not attach the article itself. The Court located the article through its own efforts, and it is clear it was published by the *Chronicle of Higher Education*.

trators" shows that she immediately rushes to judgment about male students accused of sexual assault. (ECF No. 26 ¶ 66.)

Third, Plaintiff alleges that the University was, at the time of the allegations against him, subject to a Department of Education investigation into the University's handling of sexual violence and sexual harassment complaints. (*Id.* ¶ 70.) This created "external pressure from the federal government [which] certainly motivated Defendants to handle the case against Plaintiff more aggressively, and to protect the reputation and financial well-being of [the University]." (*Id.* ¶ 71.)

Fourth, Plaintiff alleges that "respondents accused of sexual misconduct ... are habitually male." (*Id.* ¶ 72; *see also id.* ¶¶ 14, 38, 107 (repeating the accusation that respondents are "habitually male").) Although "habitually male" might be an unusual way of referring both to those who are biologically male and those who identify as male, in context it appears to be an awkward way of saying that the University investigates and disciplines men for suspected sexual misconduct far more often than women.

Considering all of this together, the Court finds no inference of gender bias that rises to the level of "plausible." To begin, Plaintiff grasps at straws in his attempt to portray Tracy–Ramirez's remarks as reported by the *Chronicle of Higher Education* as an implicit admission of gender bias. Moreover, pressure from the federal government to investigate sexual assault allegations more aggressively— either general pressure exerted by the Dear Colleague Letter or specific pressure exerted by an investigation directed at the University, or both—says nothing about the University's alleged desire to find men responsible because they are men. As for the claim that the University investigates and disciplines men for sexual misconduct

far more than women, the Court sees no inference to draw in Plaintiff's favor. Again, "the majority of accusers of sexual assault are female and the majority of the accused are male," *Austin*, 205 F.Supp.3d at 1225, and the University "is not responsible for the gender makeup of those who are accused *by other students* of sexual misconduct," *King v. DePauw Univ.*, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014) (emphasis in original).

This leaves only the vague allegation that an "all-female Title IX team, including Defendants Gonzalez and Tracy–Ramirez, ... investigate[d] the accusations against Plaintiff" (ECF No. 26 ¶ 65), and the allegation regarding Tracy–Ramirez's background in Women's Studies and victim advocacy (*id.* ¶ 66). To establish that these allegations raise a plausible inference of gender bias, the Plaintiff must supply a context in which Tracy–Ramirez's alleged bias can manifest itself. Plaintiff appears to argue that such bias manifested itself in the investigative process, and again in Tracy–Ramirez's credibility determinations.

As to the investigative process, Plaintiff asserts, with apparent incredulity, that Tracy–Ramirez investigated the accusations against him without ever receiving a complaint from Jane Doe 1 or Jane Doe 2. (ECF No. 26 ¶¶ 1, 68, 79, 92.) But OCR has long interpreted Title IX to impose such a duty. *See* 62 Fed. Reg. 12034, 12042 (Mar. 13, 1997) ("[Investigation of possible sexual harassment is] the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action."). Plaintiff does not allege that Tracy–Ramirez (or any other Defendant) would have elected not to investigate an accusation of female sexual misconduct from a third party. Furthermore, although Plaintiff alleges that many specific aspects of the truth-seeking process were unfair to him, he

does not allege that a female accused of sexual misconduct would have been treated differently (e.g., would have been allowed to see the investigative file earlier, or would have been protected by a burden of proof higher than preponderance of the evidence). Thus, assuming Plaintiff has plausibly alleged Tracy–Ramirez's pro-female bias, the complaint contains no allegations showing that such bias affected the investigative process.

As for credibility determinations, Plaintiff faces a different problem. The Court noted above that credibility determinations as between a male and a female may be the most likely circumstance in which gender bias, explicit or implicit, will have an effect. But in this case, Tracy–Ramirez's report thoroughly rebuts any inference Plaintiff intends to make in this regard. Jane Doe 1, Jane Doe 2, and ten witnesses (including seven males) all provided information tending to show that Plaintiff had committed the sexual assaults of which he was accused. In contrast, Plaintiff failed to provide Tracy–Ramirez with names of potential witnesses who could speak in his favor, refused to provide his version of events, and failed even to attempt to rebut any witness's account or explain why the witness would have a motive to falsely accuse him. In short, Tracy–Ramirez received details from Jane Doe 1, Jane Doe 2, and the various witnesses, and she received nothing but denials, procedural protests, and delay from Plaintiff. Consequently, on this record, there was simply no circumstance in which Tracy–Ramirez's alleged pro-female bias could infect her credibility determinations. In addition, Plaintiff does not allege that Tracy–Ramirez would have judged credibility differently if he had been female, or if his accuser had been male.

Finally, when Plaintiff's accusations are viewed in this light, the Court agrees with previous courts facing similar claims that, if anything, the inference of pro-victim bias is an "obvious alternative explanation," *Iqbal*, 556 U.S. at 682, 129 S.Ct. 1937 (internal quotation marks omitted), that overwhelms any potential inference of gender bias.

For all these reasons, the Court finds that Plaintiff has failed to raise a plausible inference of gender bias, and has therefore failed to state a claim for sex discrimination under Title IX.[10]

## B. Procedural Due Process

Plaintiff's second cause of action alleges that all Defendants violated his right to procedural due process. (ECF No. 26 ¶¶ 118–32.)

The Fourteenth Amendment's Due Process Clause states, "No state shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. In *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Supreme Court held that public school students have a "property interest" in their public education, and that any deprivation of that education which is "not *de minimis*" requires some form of due process. *Id.* at 576, 95 S.Ct. 729 (holding that a ten-day suspension was not *de minimis*). Many courts have recognized that a public university may not suspend or expel a student for alleged sexual misconduct without some amount of process. *See, e.g.*, *Austin*, 205 F.Supp.3d at 1221; *Cincinnati*, 173 F.Supp.3d at 600; *Gomes v. Univ. of Maine Sys.*, 365 F.Supp.2d 6, 15 (D. Me. 2005).

---

**10.** Plaintiff does not assert a disparate impact theory of Title IX liability, and in any event, courts agree that such a theory is not available. *See, e.g.*, *Brown*, 166 F.Supp.3d at 184; *Yu*, 97 F.Supp.3d at 461; *King*, 2014 WL 4197507, at *10.

Plaintiff claims he was denied due process through at least the following alleged acts by University officials:

- Suspending Plaintiff before a complaint was filed by either Jane Doe 1 or Jane Doe 2;
- Soliciting complaints from Jane Doe 1 and Jane Doe 2;
- Investigating the accusations concerning Jane Doe 1 for nearly a month before providing Plaintiff with notice of the charges;
- Investigating the accusations concerning Jane Doe 2 for nearly two months before providing Plaintiff with notice of the charges;
- Denying Plaintiff and his counsel access to the investigative file until nearly three months after Jane Doe 1's complaint was made against him. When he was provided access, he could not copy any of the information in the file;
- Allowing Defendant Tracy–Ramirez to intimidate Plaintiff, while serving as an advisor and advocate for Jane Doe 1 and Jane Doe 2;
- Allowing Defendant Tracy–Ramirez to draw an adverse inference against Plaintiff for submitting written statements concerning his defense, while Jane Doe 2 also failed to appear in person;
- Denying Plaintiff a hearing, and the right to confront his accusers, present evidence, or cross-examine witnesses;
- Leaving the evaluation of the credibility of the witnesses, the weight of the evidence, and the determination as to whether Plaintiff violated the Code to the sole discretion of Defendant Tracy–Ramirez, a biased investigator;
- Issuing a severe sanction in response to Defendant Tracy–Ramirez's sole

determination that Plaintiff violated the Code; and

- Denying Plaintiff the right to appeal any portion of the process, including his expulsion from the University on August 26, 2014.

(ECF No. 26 ¶ 130.)

1. Direct Action vs. § 1983

All Defendants argue that Plaintiff's Fourteenth Amendment cause of action should be dismissed because he pleads it directly under the Fourteenth Amendment, rather than by way of 42 U.S.C. § 1983. (ECF No. 28 at 5; ECF No. 52 at 18 n.3.) *See also Robinson v. Bd. of Regents of Univ. of Colo.*, 390 F.Supp.2d 1011, 1017 (D. Colo. 2005) ("[C]laims alleging violation of the Fourteenth Amendment must be brought pursuant to 42 U.S.C. § 1983; the Amendment itself does not provide a direct cause of action."). Plaintiff now "acknowledges that 42 U.S.C. § 1983 is the proper vehicle in which to seek redress from an individual state actor for a constitutional violation and submits that his Fourteenth Amendment claim is asserted on this basis." (ECF No. 55 at 7.)

The Court appreciates the acknowledgment but is somewhat troubled. Counsel for the Individual Defendants represents that they "brought to this matter to the attention of counsel for Plaintiff" before filing the Individual Defendants' motion to dismiss. (ECF No. 28 at 5.) The Court cannot imagine why counsel for Plaintiff failed to do anything about this defect, or on what basis counsel could insist that a direct claim under the Fourteenth Amendment should remain in the complaint. The undersigned has sanctioned a plaintiff's attorney who forced a defendant to move to dismiss in similar circumstances. *See Butt v. Wright Med. Tech., Inc.*, 2015 WL 4162576, at *3–4 (D. Colo. July 10, 2015).

Nonetheless, the defect at issue here is purely formal. There is no dispute that a Fourteenth Amendment procedural due process claim may be brought under § 1983. Plaintiff could simply add a reference to § 1983 in the heading to his second cause of action and this problem would be solved. Justice would be little served were this Court to dismiss Plaintiff's second cause of action simply as a result of such an easily rectified pleading deficiency. For purposes of this Order, the Court will construe the second cause of action as a § 1983 claim. Moreover, as will become clear shortly, the Court will require amendment for different reasons, thus giving Plaintiff an opportunity to correct this error. All counsel are warned, however, that a future lack of cooperation on easily correctable issues such as this may be grounds for sanctions.

2. Partial Sovereign Immunity for the University

■ "The Eleventh Amendment precludes anyone from suing an arm of the state or asserting a damage claim against state officers in their official capacities." *Colby v. Herrick*, 849 F.3d 1273, 1276 (10th Cir. 2017). The University of Colorado is an "arm of the state" of Colorado, *Harrison v. Univ. of Colo. Health Scis. Ctr.*, 337 Fed.Appx. 750, 753 (10th Cir. 2009), and therefore appears to be entitled to sovereign immunity, as preserved by the Eleventh Amendment.

■ Plaintiff responds that Colorado has waived its sovereign immunity: "It is well settled that a state university waives its Eleventh Amendment sovereign immunity from suit by accepting federal funds under Title IX." (ECF No. 64 at 17.) But this is true only as to claims arising under Title IX. *See* 42 U.S.C. § 2000d–7(a)(1) ("A State shall not be immune under the Eleventh Amendment of the Constitution of the

United States from suit in Federal court for a violation of... title IX of the Education Amendments of 1972 ...."); *see also Franks v. Ky. Sch. for the Deaf*, 142 F.3d 360, 363 (6th Cir. 1998) ("Congress successfully abrogated the states' Eleventh Amendment immunity from Title IX lawsuits"). Thus, "Plaintiff's [non–Title IX] claims [against the University] for monetary damages and retrospective declaratory relief are barred by the Eleventh Amendment." *Johnson*, 71 F.Supp.3d at 1230.

However, Plaintiff also requests a "declaratory judgment" that his "disciplinary record be expunged," that "the record of [his] expulsion be removed from his education file," and that "any and all records pertaining to the investigation be destroyed." (ECF No. 26 at 42.) Plaintiff appears to request relief more in the nature of an injunction than a declaratory judgment, but the Court may construe those forms of relief interchangeably, *see Mar v. Kleppe*, 520 F.2d 867, 869 (10th Cir. 1975), and in any event, "[a] declaratory judgment can then be used as a predicate to further relief, including an injunction," *Powell v. McCormack*, 395 U.S. 486, 499, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Thus, the Court understands Plaintiff at a minimum to be seeking expungement of his disciplinary record.

■ Under the *Ex parte Young* exception,[11] the Eleventh Amendment does not bar a federal court from awarding this sort of equitable prospective relief to Plaintiff. *See Johnson*, 71 F.Supp.3d at 1230 ("a request to expunge an academic record is a request for prospective relief" and not barred by the Eleventh Amendment); *see also Doe v. Cummins*, 662 Fed.Appx. 437, 444 (6th Cir. 2016) (no Eleventh Amendment bar to expunging record of sexual assault discipline from a state university's

11. *See* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

files); *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (negative entries in a student's university records stemming from an allegedly unconstitutional action presented a continuing violation sufficient to overcome Eleventh Amendment immunity); *Shepard v. Irving*, 77 Fed.Appx. 615, 620 (4th Cir. 2003) (request to expunge grade from record is not barred by Eleventh Amendment); *Thomson v. Harmony*, 65 F.3d 1314, 1321 (6th Cir. 1995) (injunction requesting expungement of negative entries from personnel record not barred by the Eleventh Amendment).[12] Accordingly, Plaintiff's claim survives to the extent he seeks expungement.[13]

However, one requirement for proceeding under *Ex parte Young* is that the defendant be an individual state official (not the state itself) charged with enforcing whatever law is at issue. *See, e.g., Kitchen v. Herbert*, 755 F.3d 1193, 1201–02 (10th Cir. 2014); *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013); 13 *Wright & Miller* § 3524.3 n.10 and accompanying text. In this case, Plaintiff alleges that he learned from a University in-house

---

**12.** It is sometimes said that "declaratory relief is … barred when it relates only to past violations of federal law." 17A Charles Alan Wright et al., *Federal Practice & Procedure* § 4232 n.21 and accompanying text (3d ed., Apr. 2017 update) ("*Wright & Miller*"); *see also Papasan v. Allain*, 478 U.S. 265, 277–78, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) ("*[Ex parte]* Young has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past …."). If these statements are taken literally, it would mean that a court could never inquire into the constitutionality of a past act (such as the constitutionality of the discipline process used against Plaintiff), even if that past act requires the state to take continuing action adverse to the plaintiff (such as disclosing his expulsion). This Court agrees with the Ninth Circuit that the cases usually cited in support of this reading of Eleventh Amendment immunity "stand only for the proposition that a plaintiff may not couch in terms of injunctive and declaratory relief a compensatory, backward-looking remedy that would be otherwise barred by the Eleventh Amendment, such as a damages or quiet title remedy." *Porter v. Jones*, 319 F.3d 483, 494 n.7 (9th Cir. 2003). To extend those cases, further "confuses liability with remedy." *Id.* at 494.

**13.** The University's motion to dismiss attacks Plaintiff's due process claim solely on Eleventh Amendment immunity grounds. (ECF No. 52 at 18.) In its reply brief, however, the University also attacks Plaintiff's procedural due process claim on its merits. (*See* ECF No. 75 at 8–9.) Having waited until the reply brief to raise this argument, the University has forfeited it at this stage of the case. *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) (arguments raised for the first time in a reply brief generally are deemed forfeited). In any event, the Court finds that Plaintiff's complaint raises a viable procedural due process claim. At a minimum, there is a fair question whether preponderance of the evidence is the proper standard for disciplinary investigations such as the one that led to Plaintiff's expulsion. The Dear Colleague Letter states that anything greater than preponderance of the evidence is "inconsistent with the standard of proof established for violations of the civil rights laws," largely referring to Title VII. Dear Colleague Letter at 10–11. But Title VII can only be enforced against employers, not individual employees, *see Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1095 n.1 (10th Cir. 2007); and in any event, Title VII liability does not create anything equivalent to the permanent notation that the University has placed on Plaintiff's transcript. Given the significant consequences of such a permanent record, it is at least open to debate whether the Dear Colleague Letter's reasoning is based on a false equivalence, and whether due process requires a stricter standard of proof. *Cf. Goss*, 419 U.S. at 575, 95 S.Ct. 729 ("If sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment."); *see also* 62 Fed. Reg. at 12045 ("The rights established under Title IX must be interpreted consistently with any federally guaranteed rights involved in a complaint proceeding.").

attorney that "the University had an obligation to disclose Plaintiff's propensity for sexual misconduct as a public safety issue." (ECF No. 26 ¶ 63.) Thus, it appears the proper defendant would be whomever is charged with ensuring this obligation is carried out. This might be one of the Defendants already present, but the Court cannot be sure. Given that it is Plaintiff's burden to establish subject matter jurisdiction, the Court must dismiss his procedural due process claim without prejudice to an amendment naming the appropriate official as a defendant and alleging that official's connection to the duty to disclose Plaintiff's disciplinary status.[14] And, given that amendment is necessary, Plaintiff should reframe his declaratory judgment request for expungement as a prayer for injunctive relief. The Court expresses no opinion on whether Plaintiff has any basis for prospective declaratory relief (as declaratory relief is normally understood).

### 3. Qualified Immunity for the Individual Defendants

■ The Eleventh Amendment does not necessarily protect the individual defendants from being sued for damages in their individual capacities. The Individual Defendants claim, however, that qualified immunity protects them from liability. (ECF No. 28 at 5–15.) "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). This Court has discretion to address the "clearly established" element before addressing whether a constitutional violation actually occurred. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

■ The plaintiff bears the burden of demonstrating that the law was clearly established at the relevant time. *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000). "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted).

■ The Individual Defendants argue that Plaintiff cannot meet his burden to show that he had a clearly established right to be free from the alleged procedural deprivations he suffered. The Court agrees. Although Plaintiff spends significant time attempting to show that courts around the country have found procedural due process violations based on allegations similar to some of his allegations (ECF No. 55 at 7–12), he spends only slightly more than a page arguing that his right to be free from such deprivations (individually or collectively) was clearly established at the relevant time (*id.* at 12–13). As for the cases Plaintiff *does* cite, none of them carries Plaintiff over that threshold, nor do they do so collectively.

Plaintiff first cites the portion of the Supreme Court's *Goss* decision concluding that a school's decision to summarily suspend certain students for ten days required due process. 419 U.S. at 574–75, 95 S.Ct. 729. But Plaintiff fails to account for *Goss*'s later caveat:

---

14. The Court expects the University's cooperation with any request from Plaintiff to identify the appropriate University official, and, once it does so, to cooperate in good faith with any request from Plaintiff's counsel for waiver of service of process. Such cooperation does not waive any defense that official might have to the procedural due process claim.

... there are recurring situations in which prior notice and hearing cannot be insisted upon. Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable ....

*Id.* at 582–83, 95 S.Ct. 729. In this case, Plaintiff was accused of two rapes. Plaintiff has cited no authority showing it was clearly established that Gonzales could not have concluded, based such an accusation, that Plaintiff was "a continuing danger" or "an ongoing threat," and therefore immediately suspendable. The fact that Gonzales suspended Plaintiff based on an anonymous phone call and apparently without any investigation is concerning, but Plaintiff fails in his burden to cite authority showing that Gonzales acted contrary to clearly established law.

Plaintiff next cites *Davis v. Regis College, Inc.*, 830 P.2d 1098 (Colo. App. 1991), for the proposition that "a student's interest in attending a public university is a constitutionally protected property right." *Id.* at 1100. This general statement says nothing about what due process protections were clearly established at the time Plaintiff was suspended, investigated, and expelled.

Plaintiff's third citation is to *Dixon v. Alabama State Board of Education*, 294 F.2d 150, 157 (5th Cir. 1961), apparently for the proposition that a public school cannot expel a student without notice to the student and an opportunity to be heard. But *Dixon*, apart from being an extra-circuit case, says nothing about how, specifically, school administrators should carry out that duty.

Plaintiff's fourth citation is to *West v. Derby Unified School District No. 260*, 206 F.3d 1358 (10th Cir. 2000), which declared, "No one disputes that a student faced with the possibility of suspension from public school is entitled to due process." *Id.* at 1364. Plaintiff appears to draw from this quote the implication that school administrators may not suspend a student before giving him or her notice and a hearing. But *West* drew this proposition from *Goss*, *see id.*, which—as already noted—endorsed an exception to this principle when a student is an ongoing threat to school safety.

Plaintiff's fifth citation is to *Staton v. Mayes*, 552 F.2d 908 (10th Cir. 1977), in which a former school superintendent brought a procedural due process claim based on the manner of his termination. In the context of a claim that the superintendent's disciplinary tribunal was biased, the Tenth Circuit stated, " 'A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases.' " *Id.* at 913 (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). This truism does not help Plaintiff. *Staton* says nothing about what form of "trial" or "tribunal" he may have been entitled to, or what sort of procedures were necessary to prevent bias. Somewhat to the contrary, *Staton* instead acknowledges that "[d]ue process...is a term that 'negates any concept of inflexible procedures universally applicable to every imaginable situation.' " *Id.* (quoting *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). Indeed, the quoted *McElroy* decision itself confirms that due process "does not require a trial-type hearing in every conceivable case of government impairment of private interest." 367 U.S. at 894, 81 S.Ct. 1743.[15]

---

**15.** To the extent Plaintiff claims he received a biased hearing, and was therefore denied due

Plaintiff's sixth citation is to *Tonkovich v. Kansas Board of Regents*, 159 F.3d 504, 518 (10th Cir. 1998). This is a "see also" citation immediately following the *Staton* citation, so the Court presumes that Plaintiff relies on it for its statement that "[a] fundamental principle of procedural due process is a hearing before an impartial tribunal." *Id.* But this broad statement is no more helpful than the similar statement in *Staton*.

■ Plaintiff's seventh and final citation is to *Sigma Chi Fraternity v. Regents of the University of Colorado*, 258 F.Supp. 515 (D. Colo. 1966), from which he extracts the following:

The test as to whether a party has been afforded procedural due process is one of 'fundamental fairness' in the light of the total circumstances.... [I]t does require adequate notice of opposing claims, reasonable opportunity to prepare and meet them in an orderly hearing adapted to the nature of the case and finally, a fair and impartial decision. * * * The requirements of notice and of a fair and impartial hearing mean that the parties must be given a fair opportunity to present their positions.

*Id.* at 528. Once again, this is too general to satisfy the "clearly established law" standard, and does not count in that analysis anyway, given that it comes from a district court decision:

A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.... [D]istrict court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity.

*Camreta v. Greene*, 563 U.S. 692, 714 n.7, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) (internal quotation marks omitted).

Accordingly, Plaintiff has failed to meet his burden to show it was clearly established that he was entitled to the procedures he claims he was denied. *Cf. Austin*, 205 F.Supp.3d at 1221–22 (alleged procedural due process requirements similar to those alleged by Plaintiff here are not clearly established in the Ninth Circuit); *Cincinnati*, 173 F.Supp.3d at 605–06 (same for the Sixth Circuit). Plaintiff's procedural due process claim will be dismissed as against the Individual Defendants because they are entitled to qualified immunity.

## C. Declaratory Judgment Asserted Against All Defendants

The only other claim Plaintiff pleads against the Individual Defendants is for a declaratory judgment that Defendants are liable as stated in Plaintiff's substantive causes of action. (ECF No. 26 ¶¶ 164–68.) The Individual Defendants argue that if Plaintiff's procedural due process claim is dismissed as against them (which it will be), then there is no basis for a declaratory judgment regarding procedural due process. (ECF No. 28 at 15.) Plaintiff responds that "there is an active Title IX claim that provides a basis for federal jurisdiction. Regardless of the outcome of the [Individual] Defendants' Motion to Dismiss, Plaintiff's Title IX claim provides federal and supplemental jurisdiction of this matter." (ECF No. 55 at 15.) This argument fails for two reasons. First, the Title IX claim is pleaded solely against the University, and its presence therefore has no relevance to the Individual Defendants. Second, the Court has already determined that Plaintiff's Title IX claim will be dis-

process, his allegations are his own conclusory editorializing based on the way the investigation played out and the fact that he was

found responsible. The Court therefore need not accept this allegation as true.

missed. Given Plaintiff's failure to provide any other basis for maintaining a declaratory judgment cause of action against the Individual Defendants, the cause of action will be dismissed as against them.

The University similarly argues that declaratory judgment should be dismissed as against it. (ECF No. 52 at 19.) Plaintiff entirely fails to respond to this argument. (*See* ECF No. 64.) Nonetheless, the Court has already found that it possesses jurisdiction over Plaintiff's declaratory judgment claim, construed as a request for an injunction, as it relates to expungement of his disciplinary record. Apart from that, the Court deems Plaintiff to have conceded the University's argument. Accordingly, Plaintiff's declaratory judgment cause of action against the University will be dismissed except as to the portions relating to expungement.

### D. State Law Causes of Action Asserted Against the University

Plaintiff asserts three state-law causes of action against the University: breach of contract, breach of the covenant of good faith and fair dealing, and "estoppel and reliance." (ECF No. 26 ¶¶ 133–63.) The University, expecting all of the federal claims against it to be dismissed, argues that this Court should decline to exercise supplemental jurisdiction over these state-law claims. (ECF No. 52 at 18–19.) *See also* 28 U.S.C. § 1367(c). But, assuming Plaintiff can locate the right state official against whom to assert his procedural due process claim, the University is not entitled to dismissal of that claim to the extent Plaintiff seeks prospective relief.

Nonetheless, there is an independent Eleventh Amendment basis for dismissal of these state law claims. *See V–1 Oil Co. v. Utah State Dep't of Pub. Safety*, 131 F.3d 1415, 1419–20 (10th Cir. 1997) (federal court may raise Eleventh Amendment immunity *sua sponte*).[16] Specifically, absent a state's consent, the Eleventh Amendment prohibits a federal court from adjudicating state-law claims against a state. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). This is so even where a federal-law claim might otherwise allow for supplemental jurisdiction over a state-law claim. *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 542, 122 S.Ct. 999, 152 L.Ed.2d 27 (2002) ("§ 1367(a)'s grant of jurisdiction does not extend to [state-law] claims against nonconsenting state defendants"); *Pettigrew v. Okla. ex rel. Okla. Dep't of Pub. Safety*, 722 F.3d 1209, 1213 (10th Cir. 2013) ("supplemental jurisdiction under § 1367 does not override the Eleventh Amendment's bar on suing a state in federal court").

The fact that the University never argued for application of this aspect of its Eleventh Amendment immunity, but only for § 1367(c) dismissal, does not amount to waiver of the University's immunity on this basis. "A state's waiver is subject to a stringent test: [it] must be express and unequivocal." *V–1 Oil*, 131 F.3d at 1421. Here, there has been no express and unequivocal waiver, but rather an obvious intent to send the state-law causes of action to state court, albeit under the wrong authority. For present purposes it is instructive that conduct seemingly far

16. "[T]he nature of the Eleventh Amendment defense is not completely clear—for some purposes, it is treated as jurisdictional and for others it is not." 13 *Wright & Miller* § 3524.4. However, the Tenth Circuit has very recently and unequivocally stated that "Eleventh Amendment immunity is jurisdictional." *Col-* *by v. Herrick*, 849 F.3d 1273, 1278 (10th Cir. 2017). But whether it is jurisdictional in the sense that it *requires* a court to raise it *sua sponte* is still a matter of debate. Nonetheless, *V–1 Oil* makes clear that this Court may appropriately exercise its discretion to raise the issue.

more indicative of waiver has been held *not* to be waiver. *See, e.g., id.* at 1419, 1421 ("At oral argument before this court, we raised the question of the Eleventh Amendment bar. The State of Utah admitted it chose not to raise the potential constitutional limitation of our subject matter jurisdiction at either the district or appellate level."; nonetheless finding no waiver of sovereign immunity); *Jicarilla Apache Tribe v. Kelly*, 129 F.3d 535, 538 (10th Cir. 1997) (filing a motion to dismiss on other grounds, "without more, does not waive the State's Eleventh Amendment immunity"). The Court holds that the University has not waived its Eleventh Amendment immunity from state-law claims prosecuted in federal court, and as a consequence Plaintiff's state-law causes of action must be dismissed for lack of subject matter jurisdiction.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. The Individual Defendants' Motion to Dismiss (ECF No. 28) is GRANTED and all claims asserted against Christina Gonzalez, Alexandra Tracy–Ramirez, and/or Jessica Doty are DISMISSED WITH PREJUDICE;

2. The Clerk shall TERMINATE Christina Gonzalez, Alexandra Tracy–Ramirez, and Jessica Doty as parties;

3. The University's Motion to Dismiss (ECF No. 52) is GRANTED as follows:

 a. Plaintiff's Count I (violation of Title IX) is DISMISSED WITH PREJUDICE, and any portion of Count VI (declaratory judgment) seeking a declaration connected to substantive liability under Count I is likewise DISMISSED WITH PREJUDICE;

 b. Plaintiff's Count III (breach of contract), Count IV (breach of the covenant of good faith and fair dealing), and Count V (estoppel and reliance) are DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction, and any portion of Count VI (declaratory judgment) seeking a declaration connected to substantive liability under Counts III, IV, or V is likewise DISMISSED WITHOUT PREJUDICE;

 c. any portion of Plaintiff's Count II (procedural due process) seeking retrospective relief is DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction, and any portion of Count VI (declaratory judgment) seeking a declaration connected to substantive liability under Count II, as applied retrospectively, is likewise DISMISSED WITHOUT PREJUDICE; and

 d. any portion of Plaintiff's Count II (procedural due process) seeking prospective injunctive or declaratory relief is DISMISSED WITHOUT PREJUDICE pursuant to Federal Rules of Civil Procedure 8 and 19 for failure to join and plead allegations regarding the appropriate state official defendant, and any portion of Count VI (declaratory judgment) seeking a declaration connected to substantive liability under Count II, as applied prospectively, is likewise DISMISSED WITHOUT PREJUDICE;

4. The Clerk shall TERMINATE the University and its Board of Regents as parties;

5. Plaintiff's Amened [*sic*] Motion for Leave to Submit Supplemental Au-

thority (ECF No. 86) is GRANTED; and

6. Plaintiff is GRANTED LEAVE, on or before **June 12, 2017,** to file a second amended complaint alleging a 42 U.S.C. § 1983 claim for violation of his Fourteenth Amendment procedural due process rights, and seeking prospective injunctive relief to remedy that alleged violation, and also naming as the defendant(s) the appropriate state official(s).